186 F.3d 82 (2nd Cir. 1999)
 CLAY CHATIN, Plaintiff-Appellee-Cross-Appellant,
v.
COMMISSIONER P. COOMBE, JR.; CHRISTOPHER ARTUZ, Superintendent; DEP. SUP. D. BLIDEN; K. DECKER, Captain; F. McDONNELL, Lt.; OFFICER P. STETZ; THE STATE OF NEW YORK; THOMAS J. GOLDRICK, Defendants,
GLENN GOORD, Commissioner of the NYS Dept. of Correctional Services, Defendant-Appellant-Cross-Appellee.
 Docket Nos. 98-2484, -2556
August Term 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: May 4, 1999
Decided: July 20, 1999
 
 Appeal from judgment of the United States District Court for the Southern District of New York, Denise Cote, J., finding prison disciplinary rule unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment. Cross-appeal from related judgment finding plaintiff's attorney fee application governed by the fee-cap provisions of the Prison Litigation Reform Act (PLRA). Held, (1) prison disciplinary rule is unconstitutionally vague as applied to inmates engaged in silent, individual, demonstrative prayer; and (2) fee-cap provisions of PLRA apply to work performed by an attorney after the effective date of PLRA, even though suit was filed prior to that date.
 Affirmed.
 LYSSA M. SAMSON, New York, NY, Assistant Attorney General of the State of New York (Dennis C. Vacco, Attorney General of the State of New York, Thomas D. Hughes, Assistant Solicitor General, Michael S. Belohlavek, Assistant Attorney, of Counsel), for Defendant-Appellant, Cross-Appellee.
 MITCHELL A. KARLAN, New York, NY (Gibson, Dunn & Crutcher, LLP, Beth L. Golden, Thomas C. Sheehan, of Counsel), for Plaintiff-Appellee-Cross-Appellant.
 Before: WINTER, Chief Judge, FEINBERG and LEVAL, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 Defendant Glenn Goord, Commissioner of the New York State Department of Correctional Services (DOCS), appeals from a judgment of the United States District Court for the Southern District of New York, after a bench trial before Judge Denise Cote. The judge found that Rule 105.11 of the DOCS Standards of Inmate Behavior (the Rules) violates the Due Process Clause of the Fifth Amendment as applied to inmates engaging in silent, individual, demonstrative prayer in a prison recreation yard. The judge also enjoined further enforcement of Rule 105.11 against such conduct. Plaintiff Clay Chatin cross-appeals from a related judgment of the district court holding that his application for attorney's fees was governed by the fee-cap provisions of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(d)(3), and awarding fees based on the statutory formula. For the reasons stated below, we affirm both judgments.
 
 I. Background
 A. Facts
 
 2
 The following facts were justifiably found by the district court or are undisputed. Chatin has been incarcerated in DOCS facilities since 1991. From 1993 to 1996, he was incarcerated at DOCS's Green Haven Correctional Facility in Stormville, New York. Chatin has been a practicing Muslim since 1993 and, in keeping with his faith, is required to pray five times daily. The timing of each prayer is dictated by the proximity of the sun, moon and earth, with the day's first prayer taking place shortly before sunrise, the fifth occurring approximately two hours after dark, and the second, third and fourth in between. Each prayer lasts between five and 10 minutes. During prayer, the worshipper moves through a series of positions known as a "rakat." To perform a rakat, the worshipper (1) stands and faces Mecca, (2) raises his hands to his ears, (3) bows with his hands either in front of him or at his side, (4) returns to a standing position, (5) kneels with knees, toes, hands and part of the face touching the ground, (6) sits, (7) returns to the bowing position, and (8) stands. The worshipper performs between two and four rakats depending on the prayer. When finished, the head is turned to the right and then to the left.
 
 
 3
 DOCS regulates the place and manner of inmates' religious practices. Rules are promulgated by the Commissioner of DOCS and approved by New York's Secretary of State, and an inmate who violates a Rule can be disciplined. Rule 105.11 states in its entirety that
 
 
 4
 [r]eligious services, speeches or addresses by inmates other than those approved by the Superintendent or designee are prohibited.
 
 
 5
 Every DOCS inmate is given a set of Rules upon entering the New York State prison system. DOCS also promulgates guidelines, known as Directives, which are used by prison officials to administer DOCS policies. DOCS Directive 4202 states in relevant part that
 
 
 6
 Individual prayer by inmates will be allowed in the privacy of their own living quarters; in designated religious areas whenever feasible.
 
 
 7
 Congregate or group prayer may only occur in a designated religious area during a religious service or at other times authorized by the Superintendent.
 
 
 8
 Demonstrative prayer will be allowed only to the extent that it is not disturbing to others.
 
 
 9
 DOCS Directives are written for the benefit of prison officials and are not distributed to inmates.[1]
 
 
 10
 Security concerns at Green Haven during the summer of 1995 raised questions as to whether individual, demonstrative prayer was permitted in the prison's recreation yard. In response to confusion among correction officers on this issue, Green Haven's Acting Deputy Superintendent for Security Services issued a Memorandum in July 1995 stating, in relevant part, that
 
 
 11
 [t]he position of this facility is that no demonstrative prayer will be allowed in any area of the facility other than designated religious areas or individual cells. This includes both individual and group prayer. . . . This memorandum supersedes all previous direction on this subject.
 
 
 12
 The Memorandum, which was addressed to "All Inmates" and posted throughout the prison, cited Directive 4202 in support of its position.
 
 
 13
 On August 30, 1995 Chatin was in the recreation yard for the evening recreation period, which lasts from 6:00 p.m. to 9:45 p.m. Inmates who wish to return to their cells early -- to pray or for any other reason -- may do so only at 7:30 p.m. and may not thereafter return to the yard. Chatin chose not to return to his cell early on August 30 because he was waiting to make a phone call to his family. Thus, Chatin was still in the recreation yard when, at approximately 8:15 p.m., the setting of the sun signaled the time for the fourth daily Muslim prayer, known as the Maghrib. Chatin proceeded to sit on a bench in an area of the yard known as the Muslim "workout court" and pray the Maghrib. While doing so, he performed three modified rakats by (1) putting his hands to the sides of his head, palms facing forward, (2) crossing his hands over his stomach, (3) leaning forward over his knees with his hands stretched out in front of him, and (4) sitting up and crossing his hands over his stomach. While the modified rakats were not as demonstrative as standard rakats, the district court found that they would have been "reasonably understood by an observer as ritualized behavior associated with prayer." When finished, Chatin turned his head to the right and then the left. By his own account, no one else was in the area of the workout court during his prayer.
 
 
 14
 After finishing his prayer, Chatin called his family. He was later approached by two correction officers who informed him that he was being placed in keeplock[2] for praying in the yard. The next day, Chatin received an Inmate Misbehavior Report charging him with conducting a "religious service in unauthorized area" in violation of Rule 105.11, disobeying a direct order in violation of Rule 106.10, and conducting individual prayer in a place other than a cell or designated religious area in violation of Directive 4202. The correction officer who wrote the Report stated that he observed Chatin "conducting individual Muslim prayer service in . . . yard," and noted that "individual prayer is allowed only in the privacy of [a] cell or designated religious area, as per memo dated 17 Jul 95."
 
 
 15
 After two disciplinary hearings in September 1995, Chatin was found guilty of conducting a religious service in violation of Rule 105.11, and not guilty of disobeying a direct order in violation of Rule 106.10. He was given a penalty of 15 days in keeplock, 15 days without package, commissary and phone privileges and a $5.00 fine. Chatin appealed the hearing officer's determination, which was affirmed by Green Haven's Superintendent a short time thereafter.
 
 B. Proceedings in the District Court
 
 16
 In January 1996, Chatin filed a pro se complaint in the district court under 42 U.S.C. § 1983, naming as defendants Acting Commissioner of DOCS Philip Coombe, Jr., and five prison officials and employees.[3] At the request of the court, the firm of Gibson, Dunn & Crutcher agreed to represent Chatin in July 1996. The case was tried without a jury in June 1997, and Chatin made a First Amendment claim, based on the Free Exercise Clause, the focus of the trial. After the trial, he requested leave to amend his complaint to conform to the evidence by adding a claim that defendants violated his right to due process under the Fifth Amendment as applied to the States via the Fourteenth Amendment. The proposed third amended complaint stated such a claim based on the allegation that Rule 105.11 "does not give fair notice on its face or in practice that it prohibits individual silent prayer."
 
 
 17
 The district court issued a thorough opinion in April 1998. Regarding the motion to amend, the court noted that defendants "could not identify any prejudice" and that this "was not surprising since the core issue in this case has never changed, that is, whether the defendants violated the plaintiff's constitutional rights by punishing him for violating Rule 105.11." The court thus granted the motion.[4] It then held that Rule 105.11 was unconstitutionally vague as applied to Chatin's silent, individual, demonstrative prayer in Green Haven's recreation yard. The court enjoined further use of Rule 105.11 to punish inmates for engaging in such prayer, and ordered DOCS to expunge Chatin's disciplinary record and to refund him $5.00 plus interest. The court did not reach Chatin's claim based upon the Free Exercise Clause.[5] The court further noted that Chatin might be entitled to costs and attorney's fees as the prevailing party under 42 U.S.C. § 1988.
 
 
 18
 Thereafter, Chatin applied for an award of $158,566.30 in attorney's fees and $14,787.22 in costs. DOCS argued that Chatin's application was subject to the fee-cap provision of the PLRA. The court agreed, holding that even though Chatin filed his suit pro se prior to the effective date of the PLRA, the fee-cap provision applied because Gibson, Dunn did not enter an appearance as counsel until after the statute took effect. Pursuant to the PLRA, the court limited counsel's hourly rate to $112.50, substantially less than the rates sought. The court also disregarded attorney time, paralegal time and costs spent on Chatin's post-trial motion to amend because Chatin had declined several opportunities before and during the trial to add the due process vagueness claim. Additional attorney time was disregarded for other reasons. After deducting hours and applying the statutory formula, the court awarded Chatin $60,816.63 in attorney's fees and $12,877.73 in costs.
 
 
 19
 This appeal by defendant DOCS and cross-appeal by plaintiff Chatin followed.
 
 II. Discussion
 A. Vagueness and Rule 105.11
 
 20
 In this court, appellant DOCS argues that the district court erred in holding that Rule 105.11 was unconstitutionally vague. The degree of statutory vagueness that the Due Process Clause will tolerate "depends in part on the nature of the enactment at issue." Hoffman Estates v. Flipside, 455 U.S. 489, 498 (1982). There is a greater tolerance for "enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Id. at 499. Vagueness is particularly problematic when it "abuts upon sensitive areas of basic First Amendment freedoms." Grayned v. City of Rockford, 408 U.S. 104, 109 (1972). We agree with Judge Cote that "Rule 105.11 carries penalties which are more akin to criminal rather than civil penalties and also implicates the free exercise of an individual's religion," and thus we scrutinize the Rule closely. On the other hand, we remain mindful that while inmates "do not shed all constitutional rights at the prison gates, . . . [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights." Sandin v. Conner, 507 U.S. 472, 485 (1995) (internal quotation omitted).
 
 
 21
 The district judge correctly applied a two-prong test to determine if a statute is unconstitutionally vague as applied:
 
 
 22
 [A] court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it.
 
 
 23
 United States v. Strauss, 999 F.2d 692, 697 (2d Cir. 1993). The judge held that the Rule was deficient in both respects. We turn first to notice.
 
 1. Notice
 
 24
 A penal statute must provide individuals with adequate notice of "what is prohibited." See Kolender v. Lawson, 461 U.S. 352, 357 (1982); Grayned, 408 U.S. at 108 (1972). Judge Cote held that
 
 
 25
 [a]lthough Rule 105.11 is clear on its face as to what conduct is prohibited conducting an unauthorized religious service or speech the text of the Rule does not provide an individual of ordinary intelligence with reasonable notice that solitary, silent, demonstrative prayer is prohibited conduct, that is, that such prayer is a religious "service" or religious "speech."
 
 
 26
 DOCS disagrees, and argues that Chatin's prayer is properly viewed as either a religious service or religious speech.
 
 
 27
 As to whether Chatin's conduct was a religious service, we note first that no Rule defines the term "religious service." The district court pointed out that
 
 
 28
 DOCS' religious experts Imam Umar; Imam Abdul Haqq, who was Muslim Chaplain at Greenhaven at the time of these events; and Jimmie Harris, Director of Ministerial and Family Service for DOCS testified that individual demonstrative prayer is not a religious service.
 
 
 29
 The district court went on to conclude that
 
 
 30
 [w]hile it is entirely possible that some individual conduct may constitute a religious service, here, there has been no testimony, or even persuasive argument, that the plaintiff's silent, individual prayer, even though accompanied by ritualized gestures, constituted a religious service or would be clearly understood by corrections officers to constitute one.
 
 
 31
 We agree. With regard to the argument that Chatin's conduct was religious "speech," while the district court did not discuss it in detail we again agree with the judge that under the circumstances of this case it was not. Like "religious services," the term "speech" does not, under the facts of this case, provide adequate notice to a person of reasonable intelligence that silent, individual, demonstrative prayer is prohibited. In any event, Chatin was charged with conducting a "religious service in unauthorized area," not with engaging in religious speech.
 
 
 32
 DOCS also argues that Chatin cannot reasonably argue that he did not understand that his conduct was proscribed by the Rule because of the existence of Directive 4202 and the July 1995 Memorandum citing it. According to DOCS, these documents provided Chatin with notice that individual demonstrative prayer was prohibited outside of his cell or a designated religious area. Chatin testified that he "knew that inmates had been sometimes disciplined for praying in the yards. Some officers let an inmate pray quietly without disciplining them, while others do not." We agree with the district court that "[t]his testimony does not show either that Chatin's conduct was clearly proscribed by the Rule or that Chatin believed it to be. It proves nothing more than that he observed arbitrary discipline of inmates praying in the prison yard." We further note that, contrary to DOCS' contention, it is altogether unclear whether Chatin's conduct even violated Directive 4202. Prior to July 1995 (and only some two months before the incident involving Chatin), the Directive had been interpreted by Green Haven officials to permit individual demonstrative prayer in places other than individual cells and designated religious areas.[6] Also, the Directive states that "[d]emonstrative prayer will be allowed only to the extent that it is not disturbing to others," and there is no evidence in the record that Chatin's conduct was "disturbing" to anyone. In fact, the correction officer who observed and charged Chatin testified that Chatin did not speak to anyone during his prayers, did not block a walkway and did not create a disturbance. Most importantly, the uncontested evidence at trial was that an inmate may not be punished for violating a Directive, and it is clear that Chatin was not. Chatin was charged in his Inmate Misbehavior Report with violating Rule 105.11, Rule 106.10 and Directive 4202, but the hearing officer considered the Report to state only two charges the alleged violations of Rules 106.10 and 105.11.[7]
 
 
 33
 As for the July 1995 Memorandum, it neither refers to the Rule nor constitutes an enforceable, reasonable interpretation of it. Indeed, Captain Kenneth A. Decker, the author of the Memorandum, testified that he lacked the authority to create a regulation stricter than the one promulgated by DOCS. In our view, the Memorandum ratchets up the regulation of religious practices set forth in Rule 105.11 by prohibiting individual demonstrative prayer. This conduct is not covered by the Rule. While the Memorandum does refer to and interpret the Directive, it seems obvious to us that if a directive cannot be used as the basis for disciplinary action, neither can a memorandum based upon a directive.
 
 
 34
 In essence, DOCS argues that we should read Rule 105.11, Directive 4202 and the July 1995 Memorandum together as one unified regulation of individual prayer on the theory that the Memorandum interprets Directive 4202 and Directive 4202 must be read in connection with the Rule. In support of this argument, DOCS relies heavily upon our decision in General Media Communications Corp., Inc. v. Cohen, 131 F.3d 273 (2d Cir. 1997). In that case, we held that a statute prohibiting the sale or rental of "sexually explicit materials," 10 U.S.C. § 2489a, on military property by military personnel acting in their official capacity was not unconstitutionally vague when "read in light of the explanatory directive implementing it." General Media, 131 F.3d at 287. DOCS contends that because we read the statute in General Media together with a "directive", we should do so here.
 
 
 35
 We disagree. The directive in General Media was explanatory and it implemented the statute. See id. at 276, 287. The directive was issued by the Department of Defense the same day the statute went into effect, see id. at 276, and provided detailed definitions of some of the terms of the statute. See id. at 276-77. The two were clearly linked. Here, neither Directive 4202 nor the Memorandum interpreting it refers to the Rule, and neither was issued contemporaneously with it. Neither purports to define terms contained in the Rule and, unlike the directive in General Media, both documents prohibit conduct not explicitly proscribed by the Rule. DOCS argues, in effect, that Chatin should have performed the the lawyer-like task of statutory interpretation by reconciling the text of three separate documents. Such a holding, on these facts, would be unfair. Accordingly, we conclude that General Media does not require us to read the Rule, Directive and Memorandum as a unified whole, and we decline to do so.
 
 
 36
 DOCS also appears to argue that because we found that the statute at issue in General Media did not rise to a level of unconstitutional vagueness despite being somewhat ambiguous, see 131 F.3d at 286, the degree of ambiguity in Rule 105.11 is tolerable. Again, we disagree. In addition to the distinctions already pointed out above, we stressed in that case that the statute "carrie[d] with it no criminal penalties." Id. Rule 105.11, on the other hand, does carry penalties of a criminal nature. Additionally, the penalty at issue in General Media was merely "an indirect one: if the [statute] is enforced . . . . [a]ppellees will lose their preferred retail outlets for members of the armed forces, but they are not prevented from selling and renting sexually explicit material directly to service members." Id. Chatin's punishment, however, was anything but indirect.
 
 
 37
 In sum, we agree with the district court that Rule 105.11 does not meet the first prong of the test for vagueness, i.e., that it must give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." Strauss, 999 F.2d at 697. We turn now to the second prong of the vagueness test.
 
 2. Discretion
 
 38
 An enactment fails to provide sufficiently explicit standards for those who apply it when it "impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis." Grayned, 408 U.S. at 108-09. The district court observed that
 
 
 39
 The DOCS' official who addressed this issue at trial indicated, in effect, that he doesn't know if the conduct in which the plaintiff engaged is a religious service, but that Rule 105.11 is the Rule that officers would use when filing a misbehavior report against an inmate for demonstrative individual prayer in the prison yard. The thrust of the testimony was that, in the absence of any Rule which clearly applied, by default Rule 105.11 was harnessed into service. . . . It is not surprising, therefore, that the treatment of prisoners who engage in individual, silent, demonstrative prayer in the recreational yard has varied greatly, with some corrections officers allowing such prayer, and other not.
 
 
 40
 Accordingly, the court held that "[t]he inescapable conclusion is that DOCS' employees have unfettered discretion in interpreting what conduct is prohibited by Rule 105.11." We agree with the district court. DOCS argues that all persons charged with enforcing Rule 105.11 fully understood it to prohibit silent, individual, demonstrative prayer in the recreation yard. This argument does not merit much discussion since, as noted above, the record clearly shows otherwise. In sum, the Rule also violates the second prong of the vagueness test.
 
 
 41
 3. Future Regulation of Silent, Individual Demonstrative Prayer
 
 
 42
 The district court held, as already noted, that Rule 105.11, as presently phrased, cannot be applied to prevent inmates from engaging in silent, individual, demonstrative prayer in recreation yards, and we affirm that holding. However, lawfully incarcerated persons retain only a narrow range of protected liberty interests, and prison officials have broad administrative and discretionary authority over the institutions they manage. See Hewitt v. Helms, 459 U.S. 460, 467 (1983). The courts accordingly owe prison officials substantial deference. We do not hold that prison officials cannot prevent such conduct by clearly stating so in a new or amended Rule and giving inmates appropriate notice. We simply do not reach that issue. Cf., e.g., Shabazz v. Coughlin, 852 F.2d 697, 700 (noting that "this court ha[s] not . . . directly addressed the constitutionality of restrictions on group prayer and prayer in prison yards."). Nor do we suggest that prison officials are prevented from disciplining inmates for engaging in silent, individual, demonstrative prayer in recreation yards through the use of already existing Rules that prohibit disturbances or interference with others, where the circumstances warrant it.[8] We simply hold that Rule 105.11 may not be "harnessed into service," as the district court aptly put it, to serve as the disciplinary basis for conduct that it cannot reasonably be said to cover.
 
 B. Applicability of the PLRA
 
 43
 The fee-cap provisions of the PLRA substantially limit fees awarded under 42 U.S.C. § 1988[9] to plaintiffs in prisoner civil rights litigation. Section 803 of the PLRA, 42 U.S.C. § 1997e(d), states in relevant part as follows:
 
 
 44
 (d) Attorney's fees
 
 
 45
 (1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under [42 U.S.C. § 1988], such fee shall not be awarded, except to the extent [authorized here].
 
 
 46
 * * *
 
 
 47
 (3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under [18 U.S.C. § 3006A (1994 ed. and Supp. III)], for payment of court-appointed counsel.
 
 
 48
 Under this cap, it is apparently undisputed that prisoners' attorneys in the Southern District of New York are limited to a maximum rate of $112.50, which is 150% of the $75 hourly rate authorized by the Judicial Conference as compensation for Criminal Justice Act attorneys in that district. The PLRA was signed into law on April 26, 1996 -- some three months after Chatin filed his suit pro se, but also about three months before Gibson, Dunn was appointed as counsel. The district court held that because the firm "did not enter an appearance until after the effective date of the PLRA . . . there is no unfairness in applying the PLRA's fee cap provisions [to Chatin's fee application]." (footnote omitted). On his cross-appeal, Chatin argues that the right to recover fees lies with the plaintiff, not the plaintiff's attorneys, and thus the date the complaint was filed should govern the PLRA's application. Under Chatin's view, the fee-cap provisions would not apply to his application since he filed his suit before the effective date of the PLRA.
 
 
 49
 However, the Supreme Court's decision in Martin v. Hadix, 67 U.S.L.W. 4500 (1999) decided after this appeal was argued, requires us to affirm the conclusion of the district court. In Hadix, the Supreme Court ruled that, in a case filed prior to the effective date of the PLRA, § 803(d)(3) applied to legal work performed after the effective date, but not to legal work performed before it. See id. at 4505. The Court stated, in relevant part, that
 
 
 50
 [t]o impose the [fee-cap provisions] for work performed before the PLRA became effective, would upset the reasonable expectations of the parties. . . . With respect to [work] performed after the effective date of the PLRA, by contrast, there is no retroactivity problem. On April 26, 1996, through the PLRA, the plaintiff's attorneys were on notice that their hourly rate had been adjusted. . . . After April 26, 1996, any expectation of compensation at the pre-PLRA rates was unreasonable.
 
 
 51
 Id. at 4504. Because Gibson, Dunn did not assume representation of Chatin until July 1996, the firm was on notice of the exact hourly rate it could expect if Chatin's suit succeeded. Accordingly, "any expectation of compensation at the pre-PLRA rates was unreasonable." Id.[10]
 
 Conclusion
 
 52
 We have considered all of the arguments of both parties, and find that they do not justify reversal on either the appeal or the cross-appeal. We conclude that (1) DOCS Rule 105.11 is unconstitutionally vague as applied to inmates engaged in silent, individual, demonstrative prayer; and (2) the fee cap provisions of the PLRA apply to the work performed by Chatin's attorneys after the statute's effective date, even though the suit was filed prior to that date. The judgments of the district court are, therefore, affirmed.[11]
 
 
 
 NOTES:
 
 
 [1]
 Certain Directives, including Directive 4202, are usually available in prison libraries.
 
 
 [2]
 An inmate placed in keeplock is confined to his cell for 23 hours per day.
 
 
 [3]
 Chatin's first amended complaint named as defendants only the State of New York, then-Commissioner of DOCS Thomas J. Goldrick and Green Haven Superintendent Christopher Artuz. His second amended complaint replaced Goldrick, apparently no longer Commissioner of DOCS, with Goord. At a July 1997 conference, the district court dismissed Chatin's claims against the State of New York as barred by the Eleventh Amendment, and the claims against Artuz for lack of personal involvement. The only remaining defendant was appellant Goord. For convenience, we hereafter refer to Goord as DOCS.
 
 
 [4]
 DOCS has not argued on appeal that the court erred in allowing the amendment.
 
 
 [5]
 Chatin again makes this claim on appeal and, like the district court, we do not reach it.
 
 
 [6]
 A June 1995 memorandum from Green Haven's Deputy Superintendent for Program Services in response to an apparent inquiry from an inmate as to prayer in the yard stated: "I certainly can appreciate the confusion, as I myself was also confused. Here is the final word. There is no congregate prayer allowed in the yards. . . . Directive 4202 states that congregate prayer will only be held in areas designated by the superintendent." (emphasis supplied). We also note that an August 1982 memorandum from Green Haven Deputy Superintendent W.E. Oldham, III to Green Haven's security staff stated that "in accordance with . . . Directive 4202 . . . Muslim inmates will be allowed to pray quietly at their work location, yard, etc."
 
 
 [7]
 As indicated above, the hearing officer determined that Chatin had violated Rule 105.11 but not Rule 106.10, and his decision never mentioned Directive 4202.
 
 
 [8]
 As indicated earlier, this is not such a case.
 
 
 [9]
 42 U.S.C. § 1988(b) provides that "[i]n any action or proceeding to enforce provisions of sections 1981, 1982, 1983, 1985, and 1986 of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorneys' fee as part of the costs."
 
 
 [10]
 We note that Chatin's argument would have to be rejected even under the reasoning of the Dissent in Hadix, which argued that "§ 803(d) is most soundly read to cover all and only representations undertaken after the PLRA's effective date." 67 U.S.L.W. at 4507 (Ginsburg, J., Concurring in part and Dissenting in part).
 
 
 [11]
 After the briefing of this appeal was completed, Chatin sent his own pro se appellate brief to this Court and informed Gibson, Dunn that he no longer desired their representation. Gibson, Dunn made a motion to withdraw as counsel shortly before oral argument, which we denied without prejudice to renewal. The firm renewed its motion after oral argument, and we now grant it. Our initial denial did not prejudice Chatin. Had we granted the motion at that time, Chatin would not have had the benefit of oral argument because we do not allow incarcerated pro se litigants to appear before us. In addition, his pro se brief, which he wanted filed, was attached to Gibson, Dunn's motion to withdraw. Even though we denied the motion without prejudice to renewal, we have read Chatin's brief and have caused it to be filed in accordance with his wishes.