# In the
# United States Court of Appeals
# For the Second Circuit

August Term 2019

Argued: March 4, 2020
Decided: July 20, 2020

Docket No. 18-3050

DANIEL WILLIAMS,

*Plaintiff–Appellant,*

V.

N. KORINES, CORRECTIONAL SERGEANT, SHAWANGUNK CORRECTIONAL FACILITY; J.T. SMITH, SUPERINTENDENT, SHAWANGUNK CORRECTIONAL FACILITY; S. KOBER, OFFENDER REHABILITATION COORDINATOR, SHAWANGUNK CORRECTIONAL FACILITY; L. PINGOTTI, DEPUTY SUPERINTENDENT FOR SECURITY, SHAWANGUNK CORRECTIONAL FACILITY; A. RODRIGUEZ, ACTING DIRECTOR OF DISCIPLINARY PROGRAM; D. UHLER, SUPERINTENDENT, UPSTATE CORRECTIONAL FACILITY; ANTHONY J. ANNUCCI, ACTING COMMISSIONER; M. LIBERTY, COMMISSIONER'S HEARING OFFICER,

*Defendants–Appellees.*[*]

Appeal from the United States District Court
for the Northern District of New York
No. 16-cv-1157 – Frederick J. Scullin, Jr., *Judge.*

---

[*] The Clerk of Court is respectfully requested to amend the caption as set forth above.

Before:    LEVAL, HALL, and LYNCH, *Circuit Judges*.

Daniel Williams, a state prisoner, brought an action against various corrections officials alleging that (1) New York DOCCS Rule 105.13 banning gang insignia or materials is unconstitutionally vague as applied to his photographs depicting family and friends wearing blue and making hand signs and (2) his placement in a special housing unit for six months following a prison disciplinary hearing determination that he had violated Rule 105.13 by possessing those photographs violated his due process rights. The district court (Scullin, *J.*) granted summary judgment to the defendants on both issues. We agree that summary judgment was proper. Accordingly, the judgment of the district court is AFFIRMED.

---

> KATHERINE ANNE BOY SKIPSEY[†] (Michael Martin, Ian Weinstein, *on the brief*), Fordham Law School, Lincoln Square Legal Services, Inc., New York, NY, *for Plaintiff-Appellant*.
>
> BRIAN D. GINSBERG, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Victor Paladino, Senior Assistant Solicitor General, *on the brief*), *for* Letitia James, Attorney General for the State of New York, Albany, NY, *for Defendants-Appellees*.

---

[†] Katherine Anne Boy Skipsey, a law student, argued the case for Plaintiff-Appellant Williams under the supervision of an attorney of Lincoln Square Legal Services, Inc. of Fordham Law School pursuant to Local Rule 46.1(e).

HALL, *Circuit Judge*:

Plaintiff-Appellant Daniel Williams, who is presently incarcerated by the State of New York, filed this action pursuant to 42 U.S.C. § 1983 against Defendants N. Korines, J.T. Smith, S. Kober, L. Pingotti, A. Rodriguez, D. Uhler, Anthony J. Annucci, and M. Liberty—all state corrections officials at Shawangunk Correctional Facility, Upstate Correctional Facility, or the New York State Department of Corrections and Community Supervision ("DOCCS")—for infringement of his due process and free speech rights under the United States Constitution. The claims stem from prison disciplinary charges brought against Williams for the possession of photographs depicting perceived signs of gang affiliation. The charges resulted in Williams's serving a six-month term in solitary confinement and the confiscation of his photographs of family and friends wearing blue and allegedly making gang-related hand signals.

Defendants moved for summary judgment and the United States District Court for the Northern District of New York (Scullin, *J.*), acting on the recommendation of the magistrate judge (Dancks, *M.J.*), granted the motion. Williams timely appealed. The questions presented on appeal are (1) whether New York DOCCS Rule 105.13, banning possession of gang insignia or material, is

unconstitutionally vague as applied to Williams's photographs, and (2) whether various actions of the hearing officers conducting his disciplinary hearings denied him procedural due process.

## BACKGROUND

Williams's personal property was searched on September 11, 2014.[1] While searching Williams's possessions, Defendant Korines identified sixteen photographs that he believed violated DOCCS Rule 105.13, which prohibits inmates from possessing "gang insignia or materials," because some of the photographs depicted individuals wearing blue and making hand signs. Defendant Korines issued Williams a misbehavior report for violating Rule 105.13. In the report, Korines explained that Defendant Kober had also reviewed the photographs. Kober "advised [Korines] that Williams, D. goes by the nickname 'Cike Bike' and has previously been identified as a Crip" and further advised that the photographs appear to be "pictures related to a gang known as the Crips, in violation of rule 105.13." Misbehavior Report at 1.

Defendant Hearing Officer Pingotti conducted a disciplinary hearing on Williams's misbehavior report over multiple days in September 2014. During the

---

[1] The general sequence of events is not seriously disputed; this description, except as indicated, reflects that sequence viewed in the light most favorable to Williams.

hearing, Williams's sixteen original photographs, misbehavior report, contraband receipt, and various clippings from magazines were made part of the administrative record. Defendant Kober testified that he had received training in gang identification. He explained that a hand forming a "C" is a Crip gang sign. Kober identified individuals, some wearing the color blue, making the "C" sign in eight of Williams's photographs (photos 1, 2, 4, 6, 9, 11, 14, and 16).

Williams disputed that the individuals in the pictures were making gang signs. Rather than forming a "C," he argued that their hands were "just down," Hearing Tr., Sept. 18, 2014, at 30 (photo 1); "just up," *id*. at 39 (photo 14); making a "B," *id*. (photo 2); giving the middle finger, *id*. at 32, 35 (photos 6 and 11); holding a cup, *id*. at 34 (photo 9); or forming closed fists, *id*. at 40 (photo 16). Kober rejected most of these suggestions but agreed that it was possible that in one of the photographs the individual's hand was unintentionally forming a "C" (photo 4). Kober explained that he and Korines confiscated the other eight photographs because they contained names or images that Kober believed were related to the Crips, but he was not certain. Hearing Officer Pingotti found no issues with those photographs, but confiscated one anyway, explaining: "You claim it is a birthday cake[], birthday candles in this, which there is clearly not." *Id*. at 37. Pingotti later

clarified that he confiscated this picture "to display that this inmate was less th[a]n truthful at times during this hearing." Superintendent Hearing Disposition at 2.

In support of his argument that the hands in his photographs were not intentionally forming "C" signs and instead making natural gestures, Williams presented images from magazines of celebrities making hand gestures that arguably, and presumably unintentionally, resembled "C" signs. In addition, Williams testified that he had had the confiscated photographs in his possession for at least a decade, and they were reviewed by guards at numerous prisons, and were never before determined to be gang related. *See e.g.*, Hearing Tr., Sept. 18, 2014, at 46 ("They scrutinize everything I have and not a time did they ever state that those pictures [were gang material]."). Williams sought witness testimony from Sergeant Cochran and Offender Rehabilitation Coordinator McCarthy, guards at other prisons who had searched his pictures and had not concluded that they were gang material, but Pingotti declined to allow Williams to call witnesses at the hearing.

Pingotti found Williams guilty of violating Rule 105.13 for possessing the eight photographs that Kober identified as having "C" hand signs. On September 25, 2014, Pingotti imposed the following punishment: (1) six months in the Special

Housing Unit (SHU); (2) loss of packages, commissary, and telephone privileges during that time; and (3) confiscation of the photographs deemed to be contraband. Williams appealed the hearing disposition to the DOCCS Commissioner.

Williams began serving six months in the SHU on September 25, 2014. On December 5, 2014, on behalf of the Commissioner, Donald Venettozzi, Acting Director of Special Housing and Inmate Disciplinary Program for DOCCS at the time, affirmed Pingotti's disciplinary decision. Williams completed his six months in the SHU on March 25, 2015.

Proceeding pro se, Williams filed an Article 78 proceeding in the New York State Supreme Court, Appellate Division. The Appellate Division vacated and remanded Pingotti's disciplinary decision because Williams was not allowed to call witnesses at the hearing. *Williams v. Annucci*, 137 A.D.3d 1355 (App. Div. 3d Dep't 2016).

Williams, at this point incarcerated at Upstate Correctional Facility, was afforded a second hearing beginning on April 4, 2016. At the second hearing, conducted by Defendant Hearing Officer Liberty, Williams again argued that the "C" signs in his photographs were common gestures and presented magazine

7

clippings of celebrities unintentionally making similar gestures. This time the administrative record included copies of the nine photographs deemed to be contraband during the first hearing (renumbered photos 1–9) rather than the original photographs. Williams requested to see his actual confiscated photographs and complained that the copies were poor, but Liberty could not locate the originals.

During the second hearing, Williams was allowed to identify and request the testimony of witnesses from other prison facilities to be called at the hearing, but he could not speak to them before the hearing and could only question them through Liberty. Officer Heely, who had training in identifying gang related material, testified: "The C hand symbol is usually for the [C]rips." Hearing Tr., Apr. 8, 2016, at 38. He reviewed the nine copies of Williams's photographs and identified "C" hand signs in two photographs (photos 4 and 5). In three other photographs, Heely identified miscellaneous hand gestures that he did not know the meaning of but believed were gang related, including "the pinky controlled and the 3 fingers out," *id.* at 35 (photo 1), and "finger spelling," *id.* at 36 (photo 2); *see also id.* at 38 (photo 3). Officer Heely did not identify gang material in two of the photographs of people (photos 7 and 8), but noted in one picture that "[he]

8

c[ould] see where that would be interpreted for a 'C.'" *Id*. at 42–43. Heely also did not identify gang material in the picture of the cake (photo 6). Whether Heely identified a gang sign in the final photograph is unclear on the record before us: the hearing transcript states "inaudible." *Id*. at 43.

During his questioning of Heely, Williams again argued that the hands were not intentionally making gang signs. He claimed the individuals were gesturing for a phone (photo 1), just open (photo 3), or giving the middle finger (photo 4). And again, he provided pictures from magazines where individuals' hands were in positions that resemble a "C" sign. Heely believed that one of the magazine clippings appeared to be a gang sign, but agreed the others were unintentional gestures or waves and were not gang signs.

Defendant Kober testified, explaining the significance of the "C" hand sign and suggesting that blue clothing is another sign of the Crips. Hearing Tr., Apr. 19, 2016, at 101, 107. He added that the hand sign "Cs over Bs" means Crips over Bloods. *Id*. at 101. He identified individuals, some wearing blue, gesturing "C" or "Cs over Bs" in seven photographs. As to two photographs, Kober was not confident enough to identify gang hand signs. When Williams asked about the clippings from magazines, Kober agreed that he believed some of the individuals

were making a "C" sign and explained that the magazine *The Source* was banned from his department because it was "consistently having hand signs flashed in it." *Id.*, at 23. Williams argued that Kober was biased against him and the misbehavior report was a result of personal prejudice. Kober testified that he was not biased.

Williams called prison teacher Todd Isabella, who had training in identifying gang related material. Liberty provided Isabella with color and black and white copies of Williams photographs which had circles around the hand gestures. Williams objected, saying that the circles on his photographs as well as Officer Liberty's questioning prejudiced his witness. Isabella responded that "it's pretty self-evident [] regardless of any being circled that [] they are in fact gang signs." Hearing Tr., May 9, 2016, at 99.

Like Kober and Heely, Isabella explained that the color blue and the hand sign "C" are associated with the Crips. Isabella identified a "C" sign in one of Williams's photographs (photo 7). Isabella also stated that the hand signs "3 over 2, Crips over Bloods," "six pointed star," and "Crips rule" are associated with the Crips. While noting that the photos were difficult to interpret because of the poor quality, he identified Crips hand signs in three photographs. Hearing Tr., May 9, 2016, at 99 (photo 1: "3 over 2, Crips over Bloods"); 93 (photo 2: "six pointed star";

photo 4: "Crips rule"). In the middle of Isabella's testimony, Officer Liberty removed Williams from the hearing because he was repeatedly interrupting her. Outside Williams's presence, Liberty asked Isabella if he could identify gang material in Williams's magazine clippings and Isabella stated that he did not believe they were gang related because "the difference is the intent . . . . [T]he pictures that were confiscated from Mr. Williams indicate that these are in fact members of a gang. [T]he intent's obviously there. Where as these ads, I don't see it." *Id.* at 100.

In sum, the witnesses who reviewed Williams's photographs agreed that at least some of them depicted individuals making "C" hand signs: photo 4 (Heely and Kober), photo 5 (Heely and Kober), photo 7 (Isabella, and possibly Heely and Kober), photo 8 (possibly Heely and Kober). None of the witnesses identified gang material in the photograph of the cake (photo 6). Only Kober identified C's in photos 1, 2, and 3. In some of these photographs, Isabella and Heely identified different signs that they believed were associated with the Crips. The witnesses' discrepancy could be explained by the quality of the copies of the photographs. Kober is the only witness who had viewed the original photographs at the first hearing. Heely and Isabella acknowledged their copies were of poor quality.

11

Hearing Tr., Apr. 19, 2016, at 112 ("Officer Heely: [M]aybe [Kober's] copy is cleaner than mine is."); Hearing Tr., May 9, 2016, at 93 ("Isabella: Some of them, . . . they're very difficult to make out with the [] quality of the photos.").

On May 9, 2016, at the end of the hearing, Defendant Liberty found Williams guilty of violating Rule 105.13 and levied the punishment that Williams had already completed after the first hearing. Williams again appealed, and Defendant Rodriguez, Acting Director of Special Housing and Inmate Disciplinary Program, affirmed the decision. On August 22, 2016, Williams requested that Rodriguez reconsider his determination. Williams also sent a letter to the DOCCS Deputy Commissioner stating that he had been found guilty of violating an unconstitutionally vague rule.

On September 22, 2016, Williams filed a § 1983 claim against Defendants for violations of due process and argued that Rule 105.13 is unconstitutionally vague as applied to his photographs. He asserted that he had possessed the photographs at other facilities, they had been reviewed numerous times, and they had never before been considered contraband. Williams sought declaratory and injunctive relief, including the return of his confiscated photographs, and monetary damages. Defendants moved for summary judgment, arguing that Williams had

received adequate process at the disciplinary hearings and that Rule 105.13 is not unconstitutionally vague.

On August 1, 2018—nearly two years after Williams asked for reconsideration from DOCCS—Donald Venettozzi, Director of Special Housing and Inmate Disciplinary Program, administratively reversed the second finding of Williams's guilt because "circumstances surrounding the incident raise questions to [sic] inmate's culpability." Venettozzi Memorandum, Aug. 1, 2018, at 1. Williams had long since served the six months in the SHU, but the infraction was expunged from his record, and Williams states that his original photographs were returned to him.

On August 31, 2018, reviewing Williams's § 1983 claim, the magistrate judge recommended granting summary judgment to the Defendants. The magistrate judge found that Williams received adequate process at his second hearing because he had notice of the charges, was able to call witnesses and present evidence, had a neutral hearing officer, and received a written copy of the decision. In addition, the magistrate judge found that Rule 105.13 was not vague because it gave persons of ordinary intelligence fair notice of what conduct was prohibited. The district court granted summary judgment against Williams, adopting the

recommendations of the magistrate judge, upholding the constitutionality of the Rule, and finding no due process violation.

Williams timely appealed the district court's decision.

## DISCUSSION

"We review a district court's decision to grant summary judgment *de novo*, resolving all ambiguities and drawing all permissible factual inferences in favor of the party against whom summary judgment is sought." *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) and citing Fed. R. Civ. P. 56(c)). "Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (quoting Fed. R. Civ. P. 56(a)).

### I. Vagueness Challenge

We first consider whether Rule 105.13 is unconstitutionally vague as applied to Williams's photographs of individuals wearing blue[2] and making "C" signs

---

[2] We note that none of the photographs that the hearing officer found to be gang-related were identified as such solely because someone in the photo was wearing an item of blue clothing. We therefore need not address the circumstances, if any, in which such a photo could be held to violate the rule. Here, the focus of the proceeding was on the hand gestures, and the references to blue clothing were at most corroborative of the witnesses' conclusion that the hand gestures were gang insignia or materials.

with their hands. We agree with the district court that it is not. "We examine as-applied vagueness claims in two steps: . . . first [we] determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and second we "consider whether the law provides explicit standards for those who apply it." *Rubin v. Garvin*, 544 F.3d 461, 468 (2d Cir. 2008) (internal quotation marks omitted); *see also Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir. 1999) (applying the test to determine if a DOCCS Rule of Inmate Behavior is unconstitutionally vague as applied). "Limitations inherent in the English language often prevent the drafting of statutes 'both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.'" *Perez v. Hoblock*, 368 F.3d 166, 175 (2d Cir. 2004) (quoting *Arnett v. Kennedy*, 416 U.S. 134, 159–60 (1974)). We have acknowledged, therefore, that "a statute or regulation is not required to specify every prohibited act." *Id.* (internal citation omitted).

Williams argues that Rule 105.13 is unconstitutionally vague as applied to him because the definitions of "gang" and "gang material" are too broad to (1) provide adequate notice that photographs of people making hand signs violate the

15

Rule and (2) cabin adequately the discretion of prison officials enforcing the Rule.

Rule 105.13 and the accompanying note provide:

> An inmate shall not engage in or encourage others to engage in gang activities or meetings, or display, wear, possess, distribute or use gang insignia or materials including, but not limited to, printed or handwritten gang or gang related material.

> Note: For purposes of this rule, a gang is a group of individuals, having a common identifying name, sign, symbol or colors, who have individually or collectively engaged in a pattern of lawlessness (e.g., violence, property destruction, threats of harm, intimidation, extortion, or drug smuggling) in one or more correctional facilities or that are generally recognized as having engaged in a pattern of lawlessness in the community as a whole. For purposes of this rule, printed or handwritten gang or gang related material is written material that, if observed in the inmate's possession, could result in an inference being drawn about the inmate's gang affiliation, but excludes published material that that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process.

Rule 105.13, N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2 (2008); *see also* Dist. Ct. Dk. No. 16 at 27.

To be sure, the language of the Rule is broad, but we are tasked with examining the application of the Rule to Williams's photographs. *Perez*, 368 F.3d at 175 ("The evaluation of whether [the regulation] is vague as applied to Perez must be made with respect to Perez's actual conduct and not with respect to hypothetical situations at the periphery of the regulation's scope . . . ." (internal

16

quotation marks and brackets omitted)). With respect to the definition of "gang,"
therefore, we need not consider whether hypothetical groups who commit minor
crimes could fall under the definition. The definition clearly covers the Crips, who
are identified by distinctive tattoos, blue clothing and blue bandanas, and are well
known for their acts of violence. *See, e.g.*, *Arizona v. Johnson*, 555 U.S. 323, 328 (2009)
(blue bandanas); *Samuel v. LaValley*, 551 F. App'x 614, 618 (2d Cir. 2014) (summary
order) (blue clothing, violence); *McTier v. People of New York*, No. 07-CV-870 (DLI),
2009 WL 792087, at *1 (E.D.N.Y. Mar. 23, 2009) (blue clothing and bandanas,
violence); *Dodge v. Cty. of Orange*, 282 F. Supp. 2d 41, 48 (S.D.N.Y. 2003) (tattoos,
violence). Moreover, Williams was surely aware that the Rule covered material
associated with the Crips: he spent six months in the SHU in 2012 for possessing a
birthday card that said "bluetiful" (ostensibly a reference to the Crips' identifying
color).

We next consider the definition of "gang insignia or materials" as applied
to Williams's photographs. The Rule explains that gang insignia or materials
"includ[e], but [are] not limited to, printed or handwritten gang or gang related
material." Rule 105.13.

17

Considering both the Rule and the accompanying note, Defendant Liberty provided the following interpretation: "For the purposes of Rule 105.13 printed gang related material is the type of material that 'if observed in the inmate's possession, could result in an inference being drawn about the inmate's gang affiliation.'" Superintendent Hearing Disposition at 4. Magistrate Judge Dancks cited with approval the following similar interpretation of the Rule:

> It is quite clear, according to the rule, that a gang sign is something that another inmate would recognize as creating an inference of a particular gang affiliation. More specificity in the prison context would be impossible because . . . individuals could change the signs to avoid detection, interfering with the security and order of the facility.

App. at 211 (quoting *Booker v. Maly*, No. 9:12-CV-246 NAM/ATB, 2014 WL 1289579, at *12 (N.D.N.Y. Mar. 31, 2014)). Williams argued to the district court that the application of the note's definition of "gang related material" to photographs was erroneous because the note and the Rule clearly limit the ban on gang related material to material that is written. The district court disagreed, citing the Rule's catch all provision "which includes but is not limited to."

> It would be obvious to a person of average intelligence that the inclusion of the phrase "is not limited to printed or handwritten gang or gang related material" indicates that the Rule proscribes conduct involving items other than "written material." In addition, a person of average intelligence would understand that the term "materials"

also includes photographs, among other things, as long as those items are "gang or gang related." Photographs of hand gestures that gang members use to identify their membership in a gang could reasonably be considered to be "gang or gang-related" materials and, thus, possession of such photographs would be a violation of Rule 105.13.

App. at 226–27.

In the same vein, Defendants offer the following "broad, but . . . straightforward" interpretation: Rule 105.13 prohibits "'Gang or gang related material' [which] is 'material that, if observed in the inmate's possession, could result in an inference being drawn about the inmate's gang affiliation." Appellees' Br. 25.

According to these interpretations, Rule 105.13 prohibits not just "gang insignia or materials," but all gang *related* material. This requires that the note's inclusion of the word "written" be ignored, which violates a canon of construction as "courts should disfavor interpretations of statutes that render language superfluous . . . ." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992). Although the note clarifies that "printed or handwritten gang or gang related material" is "written material that . . . could result in an inference . . . about the inmate's gang affiliation," nothing in the Rule or note prohibits possessing all "gang related material." Nor does the Rule or note suggest that *nonwritten* items

that could result in an inference of gang affiliation automatically qualify as "gang insignia or materials."

We are thus skeptical of the interpretations advanced by Defendant Liberty, the magistrate judge, and the district court. But to prevail on an as-applied challenge, Williams must have lacked notice that the particular materials that he was punished for possessing were proscribed. We need not decide the full scope of the Rule. Again, we must consider the Rule's clarity in the context of how it was enforced against Williams. Although Kober, Heely, and Isabella sometimes had divergent interpretations of the same hand sign, all agreed that the "C" hand sign is a symbol of the Crips, and all agreed that at least one of Williams's photographs included individuals wearing blue and making that sign.

An individual of ordinary intelligence in Williams's position would have reason to believe that gang insignia or materials includes the gang's "common identifying name, sign, symbol or colors." Photographs of individuals wearing blue and intentionally making "C" signs, therefore, fit within any reasonable understanding of the Rule.[3] We hold that Williams had adequate notice that his

---

[3] Although one might conceivably read the explanatory note to the Rule as clarifying that "printed . . . gang . . . material" is prohibited only when it is "written," this does not disturb our conclusion that an individual of ordinary intelligence had reasonable opportunity to know that Williams's photographs were prohibited. Even if the note so

photographs were prohibited by Rule 105.13 and that the provision prohibiting gang material was not vague under the first prong of our as-applied vagueness analysis.

Having held that Rule 105.13 provides adequate notice to Williams that his photographs are prohibited, we turn to the second prong: whether the Rule adequately cabins the discretion of those who apply it. *See Farid v. Ellen*, 593 F.3d 233, 243 (2d Cir. 2010). As a preliminary matter, it is hard to imagine a rule with a catch-all provision that adequately cabins discretion. *See id.* (finding a rule did not adequately cabin discretion when "the catch-all contraband rule allowed prison officials to determine in their unbounded discretion what was and was not 'specifically authorized' in the facility.").

In an as-applied vagueness challenge where the statute does not provide sufficiently clear standards to eliminate the risk of arbitrary enforcement, the challenge may nonetheless fail when "even in the absence of such standards, the

---

limits the ban on "printed . . . gang . . . material," it does not apply to "gang insignia." Any reasonable interpretation of "gang insignia" would include Williams's photographs depicting the identifying hand signs of the Crips. And, in any event, the formation of the letter "C" in a printed photograph renders that photograph "written" material. *See Write*, Merriam-Webster Online Dictionary, https://www.merriamwebster.com/dictionary/write (last visited June 20, 2020) (defining "write" as "to form (characters, symbols, etc.) on a surface with an instrument").

conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006).

We hold that Rule 105.13 provides adequate standards for prison guards to determine whether pictures of people wearing blue and intentionally making "C" hand signs are prohibited. For the same reasons that Williams had notice that the Rule covered his photographs, so too did Korines and Kober. No reasonable prison guard could have doubted that Williams's possession of photographs of people wearing blue and making "C" hand signs violated Rule 105.13 and, therefore, there was no danger that the Rule's enforcement would be arbitrary with regard to Williams's photographs.

## II. Due Process Claim

For the purpose of summary judgment, Defendants concede that Williams's punishment implicates a liberty interest. *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) ("Palmer had no right to due process at his hearing *unless* a liberty interest was infringed as a result." (internal quotation marks and brackets omitted)). In a prison disciplinary hearing, due process rights provide that "at a

minimum, a prisoner is entitled to be confronted with the accusation, informed of the evidence against him and afforded a reasonable opportunity to explain his actions." *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989) (internal quotation marks and ellipsis omitted). More specifically, an inmate must receive "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004).

Williams alleges procedural due process violations in his first disciplinary hearing, including refusal to call witnesses. We agree with the district court that all claims relating to the first hearing are moot given that the Article 78 proceeding vacated the first guilty finding and remanded for a new hearing and that when Williams was found guilty the second time, the hearing officer gave him credit for the prior punishment. That is, Williams's confinement was attributable to the second hearing and his first hearing did not deprive him of due process. *Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir. 1998) ("We need not discuss [the plaintiff's] contention that his rights were violated at the first hearing, because it became a

nullity. All findings and penalties imposed at the first hearing were vacated, and all the penalties [the plaintiff] suffered were imposed at the second hearing.").

Williams's pro se brief (filed before he was appointed pro bono counsel) alleges additional due process violations during his second hearing, including insufficiency of the evidence, denial of notice, failure to present untainted documentary evidence and verbal testimony, hearing officer bias, and removal from the hearing. Assuming *arguendo* that these claims survive, they are either unsupported by evidence or were harmless, and therefore summary judgment was appropriate.

Williams argues that none of his pictures are gang material—and therefore there is insufficient evidence to support Liberty's guilty determination—because Director Venettozzi reversed the second disciplinary ruling and the prison returned Williams's original photographs. Reversal of the disciplinary ruling does not, however, automatically establish Williams's federal claim because New York's "sufficiently relevant and probative information to constitute substantial evidence" standard is more stringent than the "some evidence standard necessary to afford due process." *Sira*, 380 F.3d at 76 n.9 (internal quotation marks omitted). The documentary evidence and testimony of three witnesses with training in gang

identification provide "some reliable evidence" that some of Williams's photographs depicted individuals wearing blue and gesturing "C," and that those are symbols of the Crips. *See Superintendent, Massachusetts Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455–56 (1985) ("[T]he relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."); *see also Sira*, 380 F.3d at 69 ("[T]he 'some evidence' standard requires some 'reliable evidence.'").

With respect to notice of the accusation, it is undisputed that Williams received the misbehavior report with the names of the guards who conducted the search, the date and time of the search, and an explanation that the guards determined that sixteen of Williams's photographs depicted hand signs that were associated with the Crips. These facts provide sufficient detail to allow Williams to prepare a defense. *Cf. Taylor v. Rodriguez*, 238 F.3d 188, 192–93 (2d Cir. 2001) (finding that a misbehavior report with "vague or conclusory" allegations from confidential informants did not provide notice).

Regarding Williams's claim that the documentary evidence shown to Isabella was tainted, Williams agreed that the color prints presented at the second hearing were accurate copies of his photographs. The circles on photographs,

while suggestive, were harmless because Isabella reviewed unmarked copies of the photographs before the hearing and explained that it was "self-evident" that people in the photographs were making gang signs. *See, e.g., Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) (applying harmless error analysis to prison disciplinary proceeding).

In addition, Williams presents no evidence that Officer Liberty prejudged the evidence, *see e.g., Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990), or otherwise demonstrated bias. "[A] plaintiff-inmate armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment." *Francis*, 891 F.2d at 47. Our review of the record reveals no evidence of bias to support Williams's claim. At the second hearing, Liberty allowed Williams to call witnesses, raise objections, and testify. In addition, Liberty recalled witnesses for further questioning in response to Williams's claims of bias. Moreover, Liberty explained that her guilty determination was supported by the testimony of Kober, Heely, and Isabella who had training in identifying gang related materials and all agreed that some of the hand signs in Williams's photographs were a symbol of the Crips.

26

Finally, with respect to Williams's removal from the hearing, there was no due process violation. In a criminal trial, a defendant who continues disruptive behavior after repeated warnings can lose his right to be present in the courtroom. *See Illinois v. Allen*, 397 U.S. 337, 343 (1970) (noting that the behavior must be "so disorderly, disruptive, and disrespectful of the court that [the defendant's] trial cannot be carried on with him in the courtroom"). Here, Williams continued to talk over Officer Liberty and wag his finger at her after she gave him multiple warnings and told him that he would be removed if he continued to interrupt her. Whatever the extent of a prisoner's due process rights in a prison disciplinary hearing, they are surely no greater than those accorded a defendant in a criminal trial. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Whatever right Williams had to be present at his disciplinary proceeding was lost when he continued the disruptive and disrespectful behavior after Liberty's multiple warnings.

In sum, we agree with the district court that Williams received a hearing that provided the minimal requirements of procedural due process. We have considered Williams's remaining arguments and find them to be without merit.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is

**AFFIRMED**.